UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRIAN K. SEIGFREID,

        Plaintiff,

v.                                    Case No. 16-C-1696

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER

      This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Brian K. Seigfreid's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.  42 U.S.C. § 405(g).  Plaintiff alleges that the Administrative Law Judge (ALJ) erred in his assessment of the evidence and that his decision is not supported by substantial evidence.  For the reasons set forth below, the Commissioner's decision will be affirmed.

## BACKGROUND

      On August 30, 2012, Plaintiff, then age 45, filed an application for DIB and SSI with an alleged onset date of January 10, 2010, due to depression, headaches, right arm issues, and fibromyalgia.  R. 279–81, 329.  The Social Security Administration (SSA) denied the applications initially on January 7, 2013, and upon reconsideration on August 12, 2013.  R. 152, 168.  After his application and request for reconsideration were denied, Plaintiff requested an administrative hearing.

ALJ Barry Robinson held a hearing on February 9, 2015. Plaintiff, who was represented by counsel, and a vocational expert both testified. R. 44–77.

At the hearing, Plaintiff testified that he had completed the ninth grade before dropping out of school due to the break-up of his family and related issues. R. 49. As an adult, he testified that he had worked in construction and related fields. He had last worked for Select Plastering, where he plastered the inside and outside of buildings for over five years. R. 49–50. Before that, he restored buildings that had been damaged by fire or water. R. 51.

When asked what physical conditions limited his ability to work, Plaintiff responded his back, neck, legs, buttocks, right arm, and hands. R. 52. He had previously injured his right wrist while working for Select Plastering. R. 404. He had radial tunnel and carpal tunnel surgery performed on that wrist on January 10, 2013. R. 1092–95. At the hearing, he testified that his arm was still sore and that he could only use it for about two to three hours a day before he could not move or bend it anymore. R. 53. He also testified he had been diagnosed with fibromyalgia, which caused him pain in his back, neck, and legs, and made sitting difficult. *Id.* He elaborated that even alternating between sitting and standing was too difficult for him to maintain over an eight-hour work day. R. 57. He had received steroid injections for the back pain but was not experiencing relief from the pain. R. 56. He also explained that he had been diagnosed with bipolar disorder and depression. R. 54–55. In addition to his diagnoses, Plaintiff testified that he had concentration problems for the past five or so years. R. 62.

Plaintiff testified that he lived in a two-story, four-bedroom home. R. 55. He explained that he did not use three of the bedrooms and that generally he cared for the house, but occasionally his mother would provide assistance. R. 55–56. In his free time, he testified he would watch TV,

"monkey around out in the garage," sell his fishing gear online, and get together with friends and family about once a month. R. 56, 58–59. He also explained that he hadn't fished in six months because he couldn't alternate between standing and sitting for that long of a period. R. 58. And when he did fish, he had to cast with his left-arm because it was too painful to use his right hand, even though he is right-hand dominant. R. 59.

Medical documentation in the administrative record, beginning in June 2009, revealed that Plaintiff injured his right wrist and elbow while setting up scaffolding at work. R. 404. Dr. Jon Cherney treated him for his injury and cleared him to return to work at a medium-exertion level. On April 27, 2010, Dr. Cherney declared that Plaintiff's elbow was 4% permanently partially disabled and that he should have a permanent work restriction of medium-exertion level work. R. 401, 413. In August 2011, Dr. Jagdeep Sodhi began treating Plaintiff for right wrist and forearm pain. R. 525–27. By July 2012, Dr. Sodhi had diagnosed Plaintiff with right radial tunnel syndrome, right lateral epicondylitis, and chronic right carpal tunnel syndrome. R. 516. After conservative treatment failed to provide relief, Dr. Sodhi performed radial tunnel and carpal tunnel release surgery in January 2013. R. 1092–95. Plaintiff completed physical therapy and by June 2013, he reported to Dr. Sodhi that his forearm and elbow pain had been completely resolved. R. 827.

While receiving physical therapy for his elbow and forearm, Plaintiff began complaining of pain in his right shoulder. R. 763, 765–66. Dr. Sodhi ordered physical therapy for his shoulder as well. Upon completion of physical therapy, Plaintiff had reported his shoulder had improved 80% and he had returned to household chores, like lifting laundry baskets, and throwing a ball with his kids. R. 830, 880–81. His medical records also revealed that in April 2011, Dr. Marlon Hermitanio

diagnosed Plaintiff's diffuse pain to be chronic pain syndrome from fibromyalgia for which his headaches are a pain generator. R. 424–27.

In a decision dated June 11, 2015, the ALJ found Plaintiff was not disabled. R. 36. Following the SSA's five-step process, the ALJ concluded at step one that Plaintiff met the insured status requirements through December 13, 2015, and had not been engaged in substantial gainful activity for a continuous 12-month period since May 1, 2010. R. 25–26. At step two, the ALJ found that Plaintiff's fibromyalgia, right arm carpal tunnel syndrome, right shoulder degenerative joint disease, and major depressive disorder all constituted severe impairments. R. 26. The ALJ found that the complete medical record indicated that Plaintiff also suffered from mild arthritis of the bilateral hips, migraines, diverticulitis, and memory problems, but concluded that these impairments were nonsevere in that they were well-managed and caused no more than minimal physical or mental limitations. *Id*. At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal any of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined Plaintiff had the following residual functional capacity (RFC):

> [Plaintiff has the ability to] perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant is limited to frequent overhead reaching with his right upper extremity and frequent handling and fingering with his right hand. The claimant can perform simple, routine and repetitive tasks in a work environment that involves simple, work-related decisions with few, if any, work place changes. The claimant requires a job where there is only occasional interaction with co-workers, supervisors, and the public and where interaction with the public is not a primary component of the job.

R. 29. Based on the testimony offered by the vocational expert at the hearing, the ALJ determined at step four that considering his age, education, and work experience, Plaintiff would not be able to return to his past work. R. 34. The ALJ concluded at step five, again based on the testimony of the

vocational expert, that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as garment folder, photocopy machine operator, and ironer. R. 35. Based on these findings, the ALJ determined Plaintiff was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on October 24, 2016. R. 1.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

Plaintiff argues that the ALJ made several errors. First, Plaintiff argues that the ALJ's determination at step two of the sequential evaluation process that Plaintiff's hip pain, headaches, and memory problems were not severe is not supported by the substantial evidence. Second, Plaintiff argues the ALJ improperly relied on daily living activities in rejecting his allegations of severe symptoms and limitations. Third, Plaintiff argues the ALJ erred in assessing the medical source opinion evidence. Lastly, Plaintiff argues that the ALJ's RFC is contrary to substantial evidence.

**A. Plaintiff's Nonsevere Ailments**

Plaintiff alleges that the ALJ's determination that Plaintiff's hip pain, headaches, and memory problems were not severe is not supported by substantial evidence and that the ALJ erred by failing to incorporate them into the RFC. At step two, as noted above, the ALJ found that Plaintiff's hip pain, migraines, diverticulitis, and memory problems were nonsevere impairments. R. 26. The ALJ explained that Plaintiff's medical records established that Plaintiff had these conditions, but they appeared to be well controlled with medication and none of them caused more than minimal physical or mental limitations in Plaintiff's ability to do basic work activities. *Id*.

Plaintiff contends that this was error. Turning first to his hip pain, he points to the medical records showing that he began complaining of hip pain in July of 2011. R. 480. In December 2011, Plaintiff received treatment for his hip pain, including hip steroid injections. R. 564–65. An x-ray in January 2012 showed a subchondral cystic change that may be indicative of early degenerative change. R. 460. Over the next several years, he continued to periodically complain of hip pain, often in conjunction with his other pain complaints, and he occasionally received steroid injections

to alleviate the pain. Given this history, Plaintiff contends that the ALJ erred in finding that his hip pain was not a severe impairment.

A severe impairment is an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c). The determination of whether an alleged impairment is severe at step two of the SSA's sequential evaluation process is essentially a "de minimis" screening device that allows the SSA to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *see also Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990) (noting that severity requirement is essentially "a *de minimis* screening device"). If no severe impairments are found, the case ends with a denial of the application. But as long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. Therefore, the step two determination of severity is "merely a threshold requirement." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999).

In light of the low threshold for finding an impairment severe, Plaintiff may be correct that the ALJ erred in failing to include his hip condition among his severe impairments. To be sure, the ALJ's determination that it was not severe had some basis in the record. Plaintiff did not list his hip pain in the Disability Report he submitted in support of his application for benefits among the medical conditions that limited his inability to work. R. 329. Nor did he mention it in his testimony at the hearing on his claim when he was asked by his own lawyer to name the physical conditions that limited his ability to work. His response was: "My back. My neck. My legs. Actually, my buttocks

7

hurt a lot." R. 52. Neither of the state agency medical consultants who reviewed Plaintiff's file identified hip pain as an impairment that limited his ability to work. R. 90–92, 126–28. In addition, when Plaintiff asked Dr. Bhattacharyya, the doctor at Advanced Pain Management who was treating Plaintiff for his hip and other pain, for a note stating he could not work, Dr. Bhattacharyya stated he did not feel this was appropriate and instead would encourage Plaintiff to work. R. 814. Nevertheless, given the history described above, and the relatively low threshold for finding an impairment severe, Plaintiff's argument that his hip pain should have been found severe is not without merit.

Even if the ALJ did err in finding Plaintiff's hip condition nonsevere, however, the error was harmless. This is because the ALJ did find that several other impairments were severe and thus continued on with the sequential evaluation. As long as the ALJ considered the limitations allegedly caused by Plaintiff's hip pain as he continued the evaluative process, no harm can be shown. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (holding that regardless of whether plaintiff's chronic fatigue syndrome is severe, ALJ's determination that it was not "is of no consequence with respect to the outcome of the case" because the ALJ was obligated to proceed with the evaluation process after recognizing other severe impairments); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [appellant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of this entire constellation of ailments. . . .").

Here, it is clear that the ALJ gave full consideration to the limitations allegedly caused by Plaintiff's hip pain in determining his RFC. The ALJ explicitly noted that "[o]n July 29, 2014, the claimant had been diagnosed with osteoarthritis of the right hip and received a hip joint intraarticular injection." R. 30–31. The ALJ also noted that "[o]n September 23, 2014, after complaints of neck,

low back and bilateral hip pain, the claimant was diagnosed with lumbar facet arthropathy and received a lumbar medial branch block at bilateral L3, L4 and L5 root levels." R. 31. More importantly, the alleged limitations caused by Plaintiff's hip pain were not in any meaningful way distinguishable from the more generalized pain in his back, neck, legs, and buttocks attributed to the fibromyalgia, osteoarthritis, and lumbar facet arthropathy identified by the ALJ. The crucial issue in the case was not so much the exact cause of Plaintiff's pain, but the severity, persistence, and limiting effect of the pain and other symptoms. Because the ALJ gave careful attention to this issue in the balance of his decision, the fact that he found Plaintiff's hip condition nonsevere, even if error, had no impact.

Much is the same of Plaintiff's headaches and memory problems. Plaintiff's complaint of headaches was related to his fibromyalgia, as his doctor reported that Plaintiff's headaches are a pain generator for his fibromyalgia. R. 30. And his memory problem, to the extent it was not a temporary side effect of one of Plaintiff's medications, was viewed as a symptom of his mental impairment. R. 33. The ALJ was not unreasonable in finding that neither condition, viewed separately, constituted a severe impairment. Plaintiff did list headaches, but not memory problems, in his Disability Report as one of the conditions that limited his ability to work. R. 329. Neither condition was among the physical impairments he named during the hearing and, in response to his attorney's question asking whether there were any conditions that limited his ability to work mentally, he named only bipolar disorder and stress. R. 54. At no time during the hearing, either in response to his attorney's question or those of the ALJ, did Plaintiff ever suggest that either headaches or memory problems limited his ability to work. In light of Plaintiff's own testimony and the medical records showing Plaintiff's positive response to various medications that were

prescribed, the ALJ's finding that neither condition was severe was not unreasonable. But to the extent the ALJ did err in failing to find those conditions severe, the error was harmless since the evaluative process continued and the ALJ was obligated to consider any limiting effects of those conditions in the RFC. Plaintiff's claim that the ALJ erred in failing to find these conditions severe is, like his argument about his hip pain, in reality, an argument about the RFC. Before turning to that issue, however, I will address Plaintiff's argument that the ALJ erred in assessing his credibility and the opinion evidence, since the RFC determination is dependent upon those findings as well.

## B. Credibility Assessment

Plaintiff argues that the ALJ erred in improperly assessing the credibility of his statements concerning the limiting effects of his symptoms. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by his impairments. *See* 20 C.F.R. § 416.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.* The ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of his symptoms are consistent with the objective medical evidence and the other evidence of record.

Until recently, the SSA viewed the evaluation of the intensity, persistence, and limiting effects of a claimant's symptoms as a credibility determination. *See* SSR 96-7p. In March 2016, the SSA issued a new ruling regarding the evaluation of a claimant's symptoms. SSR 16-3p; "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029 (effective March 28, 2016). This new ruling supersedes SSR 96-7p. In adopting SSR 16-3p, the SSA eliminated the term "credibility" from its sub-regulatory policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2. The question the SSA now asks under SSR 16-3p is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.* The SSA republished SSR 16-3p on October 25, 2017, to clarify that the regulation should only be applied to determinations and decisions issued on or after March 28, 2016. *Id.* at *1. Since the decision in this case was issued on June 11, 2015, SSR 16-3p does not apply and SSR 96-7p is the ruling that governs my review here.

A court's review of a credibility determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

In this case, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. The ALJ further concluded, however, that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. R. 30. Plaintiff argues the ALJ erred in reaching the later conclusion because he improperly relied on his activities of daily living. ECF No. 10 at 17–18.

Before turning to the ALJ's discussion of Plaintiff's daily activities and how they bear on the credibility of his statements, it is important to note that it was not only his consideration of Plaintiff's activities that led the ALJ to doubt the credibility of Plaintiff's assertions that his impairments were disabling. The ALJ first noted that his allegations of severe functional limitations were not supported by the objective medical evidence. In this connection, the ALJ noted that although Plaintiff's rheumatologist had reported in April 2011 that Plaintiff's diffuse pain with diffuse tender points are most likely related to chronic pain syndrome from fibromyalgia, "more recently, fibromyalgia diagnoses have not been consistently indicated in the claimant's treatment records." R. 30. The ALJ noted, for example, that on February 17, 2014, while Plaintiff received treatment for upper quadrant pain, "medical evidence of record documents that he had no myalgias or arthralgias, and no headaches, numbness, tingling or weakness." *Id*. (citing R. 943). Instead, the ALJ noted that Plaintiff's pain complaints were attributed to such other conditions as myofascial pain, osteoarthritis, and degenerative changes in the spine. According to a September 2014 report, his pain was localized without radiation. R. 31 (citing R. 1136). Of course, as noted above, it is the severity, persistence, and limiting effects of Plaintiff's pain, not the precise cause thereof, that is determinative of his functional capacity. But it was not unreasonable for the ALJ to question the credibility of Plaintiff's claims in the face of his doctor's shifting diagnoses to take into account his shifting symptoms.

The ALJ also noted inconsistencies between Plaintiff's account of the effects of his right shoulder, wrist, and elbow problems and the medical records relating the treatment of those conditions. He began complaining of right shoulder pain while in post-surgery physical therapy for his right arm and wrist. R. 760–62. Radiology reports at the time revealed no bone or joint abnormalities. R. 1087. A September 2013 MRI revealed no evidence of rotator cuff or labral tear, only mild arthrosis of the acromioclavicular joint. R. 1067. Although medical reports documented adhesive capsulitis in his right shoulder, Plaintiff was non-compliant with recommended home exercise regimen. While in physical therapy for his shoulder, he spent two days cutting and installing new flooring in his home. R. 31 (citing R. 788–89). By his last therapy session, he reported 80% improvement in the right shoulder despite claiming it was still bothersome with resisted activities, even though he was able to perform tasks at home like lifting laundry baskets and playing catch with his children. *Id*.

Plaintiff testified that he injured his right wrist in 2009 and had received a 4% permanent partial disability award due to pain, decreased endurance, and permanent restrictions of his right elbow. The ALJ noted, however, that despite Plaintiff's claim in his Function Report that he had difficulty using his hands as a result of his injuries or conditions, the medical records relating to his carpal tunnel syndrome state that the surgery performed on his right wrist was successful. R. 30–31 (citing R. 363). While he was in post-surgery physical therapy, he was using his right arm to do yard work and cut and install new laminate flooring in April 2013. R. 789, 795. By a follow-up visit with his treating doctor on June 26, 2013, Plaintiff reported that in regard to his forearm and elbow, his pain was "completely resolved." R. 31 (citing R. 1069). There were no other reports documenting complaints of right hand or elbow pain. *Id.*

13

In addition to the objective medical evidence, the ALJ also found that "the claimant's demonstrable activities cast doubt on the claimant's allegations of severe symptoms and limitations." R. 32. By his own account, Plaintiff had gone fishing three times in the last year though not for the last six months before his hearing. R. 30. The ALJ found it of great significance that Plaintiff was the primary caregiver for two elementary school-aged children. R. 32. He also found it significant that Plaintiff reported no difficulties doing household chores, like lifting laundry baskets, yard work, playing catch with his children, and working in the garage. *Id*. And despite his complaints of severely limiting shoulder and arm pain, Plaintiff installed new flooring in his home. *Id*. The ALJ then explained: "Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. I find that the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations." *Id*.

Plaintiff argues that "[t]he ALJ improperly equated activities of daily living with full-time work." ECF No. 18 at 5. He notes that it took him twice as long (two days instead of one) to complete the flooring project that the ALJ thought inconsistent with his claimed disability, and he needed physical therapy afterwards. He also contends that he was severely limited in performing small errands and hadn't been fishing for six months. *Id.*

In essence, Plaintiff seems to argue that the ALJ's credibility assessment lacks conclusive evidence that he exaggerated his symptoms. Of course, conclusive evidence is neither required nor possible under these circumstances. How does one ever prove that another person cannot work an eight-hour day, five days a week without following the person and monitoring his activities? Even if the person sits at home watching television the entire week, all that is proven is that the person did

not engage activities the demonstrate an ability to hold a job, not that he cannot. What is required of an ALJ under these circumstances is a rational explanation of how the ALJ arrived at the conclusion he reached in light of the evidence before him. The ALJ provided that here.

Contrary to Plaintiff's contention that the ALJ equated Plaintiff's ability to conduct the activities he admitted with full-time employment, the ALJ instead used them to assess the overall credibility of his "allegations of severe symptoms and limitations." R. 32; *see Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013) ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability."). Plaintiff is correct that the fact that he spent a weekend putting a new laminate floor in his girlfriend's bedroom doesn't prove he can perform light work on a full-time basis. But it is not unreasonable for the ALJ to conclude, especially given the lack of strong medical evidence, that if Plaintiff had as severe and disabling of symptoms as he alleged, he would not undertake such arduous work even for a weekend. Fishing three times in the last year, mowing the lawn, maintaining one's home, caring for elementary school-age daughters, and engaging in throwing activities with them, likewise, does not necessarily translate into the ability to perform full-time work either. But are those the activities of a person who claims he is unable due to chronic mental and physical impairments to go to work? The ALJ thought not, and his conclusion is not unreasonable nor is it patently wrong.

15

## C. Opinion Evidence

Plaintiff also contends that the ALJ erred in assessing the various medical source opinions. More specifically, he argues that the ALJ erred in giving parts of Dr. Weber's opinion little weight because the ALJ failed to provide sufficient reason for discounting the opinion. Dr. Weber performed a mental status evaluation on Plaintiff on December 14, 2012, and concluded that Plaintiff had moderate limitations in his ability "to understand, remember, and carry out simply instructions." R. 727. The assessment appears to be based off an examination and interaction with Plaintiff and an interview of Plaintiff's girlfriend. R. 721–30. Dr. Weber does not appear to have had access to Plaintiff's medical records, but rather, received Plaintiff's medical history from conversation with Plaintiff. R. 721.

The ALJ gave this opinion little weight because it was not supported by the medical record as a whole and was inconsistent with the determinations of the state agency psychological consultants. R. 33–34. Plaintiff argues that the ALJ should give more weight to Dr. Weber because he actually examined Plaintiff and neither of the state agency psychological consultants did. However, whether a medical source has examined a patient is just one of several factors an ALJ considers when determining how much weight to give a medical opinion. 20 C.F.R. § 404.1527(c). Other factors include whether it is a treating physician's opinion, whether there is medical evidence to support the opinion, and whether the opinion is consistent with the remainder of the evidence. *See* § 404.1527(c)(2)–(4). Here, the ALJ determined that Dr. Weber's opinion that Plaintiff would have moderate limitations in his ability to understand, remember, and carry out even simple instructions was inconsistent with the rest of the medical evidence.

Instead, the ALJ assigned greater weight to the opinions of Dr. Deborah Pape and Dr. Susan Donahoo, the two state agency consultants who reviewed the entire file and disagreed with Dr. Weber. Both concluded that Plaintiff would not have moderate difficulties in carrying out simple instructions. R. 90, 107, 126, 144. The ALJ explained that he gave great weight to the opinions of Dr. Pape and Dr. Donahoo in this regard because they rendered their opinions "after a thorough review of the claimant's medical records and are generally consistent with the record as a whole." R. 33. The ALJ also noted that state agency psychologists are "highly qualified psychologists and experts in the evaluation of the psychological issues in disability claims under the Act." *Id.* (citing SSR 96-6p).

The ALJ's assessment of Dr. Weber's opinion is supported by substantial evidence. In addition to the contrary opinions of Drs. Pape and Donahoo, the ALJ noted that Plaintiff was able to sell fishing gear online, watch television, drive a car, and shop for groceries. R. 28. He also was able to use a jig saw and a caulking gun to cut out and install a laminate floor in his girlfriend's bedroom. R. 31. Likewise, during his assessment with Dr. Bobholz, Plaintiff informed her that his mental ability did not have an effect on his usual daily living skills, like driving. R. 510. And despite alleging memory difficulties, Plaintiff was able to go through his entire medical history with Dr. Xiang-Yan Yi in April 2011 without difficulty. R. 494–95. In sum, this is substantial evidence to support the ALJ's determination that Dr. Weber's assessment was inconsistent with the record in its entirety.

Additionally, Plaintiff alleges that the ALJ erred by "picking and choosing" the weight assessed to portions of Dr. Weber and Dr. Foster's opinion. ECF No. 10 at 19. Plaintiff alleges that an ALJ is empowered to weigh the value of an opinion as a whole, but he cannot pick and choose

weights for different portions of the opinion, and in doing so, the ALJ substituted his opinion for that of the providers. Plaintiff cites 20 C.F.R. § 404.1527, but nothing in that regulation stands for the proposition that an ALJ must accept the entirety of a physician's opinion. On the contrary, the Social Security Administration has said the opposite. In SSR 96-2p, the Administration explained:

> It is not usual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not. Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source.

SSR 96-2p, 1996 WL 374188, at *2 (1996). The Administration anticipated situations where an ALJ may have to weigh different portions of a medical opinion separately and that an ALJ may give portions of an opinion controlling weight, while not giving controlling weight to the entire thing. If ALJs are empowered to assess controlling weight to only portions of a medical source's opinion, then it follows that they are also empowered to assign different weight levels to different portions of a medical source's opinion, and courts have held as such. *See also Stephens v. Colvin*, No. 14-cv-3117, 2016 WL 1271050, at *10 (N.D. Ill. Mar. 29, 2016) ("Crucially, though, an ALJ is not required to credit every part of a medical opinion just because he credits one part."), *aff'd*, 671 F. App'x 390, 390 (7th Cir. 2016).

Although the ALJ is not required to weigh every part of an opinion identically, the "ALJ must explain the logical bridge between the evidence and a decision to give different weights to different parts." *Diaz v. Berryhill*, No.16-C-6559, 2017 WL 1652577, at *3 (N.D. Ill. May 1, 2017) (citations omitted). The ALJ did just so when he explained that he was not crediting Dr. Weber's

18

determination that Plaintiff had moderate limitations in his ability to understand, remember, and carry out simple instructions because it was inconsistent with the record as a whole, unsupported by medical evidence, and inconsistent with the determinations of Drs. Pape and Donahoo. R. 33–34. The ALJ also explained that he was according great weight to the remainder of Dr. Weber's opinions about Plaintiff's ability to interact with coworkers and supervisors; maintain concentration, attention, and pace; withstand workplace stress; and adapt to changes. *Id*. The ALJ did so because it was supported by the record as a whole, and subsequently consistent with Drs. Pape and Donahoo. R. 33. The ALJ has built a sufficient logical bridge between the evidence and his decision to assign different weights to different portions of Dr. Weber's opinion.

Likewise, the ALJ built a logical bridge in explaining the different weights he assigned Dr. Foster's RFC opinion. Dr. Foster determined that Plaintiff was capable of light work but restricted Plaintiff to limited overhead reaching and limited handling with his right upper extremity. R. 33. The ALJ gave great weight to Dr. Foster's determination that Plaintiff was capable of light work because it was consistent with the medical record as a whole. *Id*. The ALJ gave little weight, however, to Dr. Foster's opinion that Plaintiff was restricted to limited overhead reaching and limited handling with his right extremity because it was inconsistent with the rest of the medical record that indicated that Plaintiff was completely, or nearly completely, healed with his right arm and shoulder issues. In finding that Plaintiff was capable of frequent overhead reaching and handling, the ALJ noted that Plaintiff's physical therapy reports indicated an 80% improvement in shoulder pain. R. 31, 880. He also noted that Plaintiff was performing lifting activities and throwing activities at home. *Id*. As to Plaintiff's wrist and hand, the ALJ noted that Plaintiff reported his forearm and elbow pain completely resolved post surgery and physical therapy. R. 31, 827. This is substantial evidence to

support the ALJ's determination that Plaintiff was only restricted to frequent overhead lifting and handling, and the ALJ built a sufficient bridge to explain why he accorded different weights to different portions of Dr. Foster's opinion.

Plaintiff also contends that the ALJ erred in giving great weight to the opinion of Dr. Bobholz, the neurosurgeon that noted his memory problems, but then ignoring her statement that Plaintiff "will likely require added support for his memory and attention problems, with possible accommodations including extended test taking time and testing in a minimally distracting room." R. 33 (citing R. 512). But as the Commissioner points out, the ALJ did not ignore Dr. Bobholz's statement. In fact, the ALJ quoted it in full and then explained how he intended to accommodate this limitation in the RFC: "Therefore, I find the claimant can perform simple, routine and repetitive tasks in a work environment that involves simple, work-related decisions with few, if any, work place changes. The claimant requires a job where there is only occasional interaction with co-workers, supervisors and the public and where interaction with the public is not a primary component of the job." *Id.* A job that involves "simple, routine and repetitive tasks in a work environment the involves few, if any work place changes" is not one that taxes a person's memory. It is not like test-taking where each question calls for new and different information. And the limitations on work place changes and interaction with others would address the need for minimal distraction.

Lastly, Plaintiff argues that the ALJ erred in not addressing the work capability forms Dr. Sodhi filled out for Plaintiff while he recovered from wrist and elbow surgery for radial and carpal tunnel, which occurred in January 2013. Plaintiff cites a form signed by Dr. Sodhi on April 10, 2013, in which he released Plaintiff to light work on that day with a "maximum lifting" restriction that appears to be 25 pounds. R. 831. Plaintiff contends the form states the "maximum lifting"

restriction is less than 5 pounds, while the Commissioner believes it is 2.5 pounds. Neither party's interpretation makes sense because the "frequent lifting" weight on the form is 10 pounds. Regardless, this limitation was only temporary, and a similar form signed by Dr. Sodhi on June 26, 2013, has no maximum lifting limitation. R. 828. In his September 18, 2013 report Dr. Sodhi notes that the follow-up MRI done on September 12, 2013, showed no abnormality that would warrant further treatment. He concludes his report with the statement: "From my standpoint, Brian is not disabled." R. 1067. The latter opinion, while perhaps telling, was given no weight by the ALJ because it was on an issued reserved to the Commissioner. R. 34. In any event, the ALJ did not error in failing to address the temporary restrictions imposed for the healing period after Plaintiff's surgery.

## D. Residual Functioning Capacity

Plaintiff's criticisms of the ALJ's determination of the RFC have been largely addressed in the previous discussions of his criticism of the ALJ's assessment of his credibility and the expert medical opinion. He contends, for example, that he repeatedly complained of chronic, diffuse pain, which limited his ability to sit and stand, and was severe enough to occasionally require an Emergency Room visit and extensive therapy. But as the above discussion shows, the ALJ did not find Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms credible. It was therefore entirely reasonable not to include them in the RFC. Plaintiff also complains that the ALJ failed to incorporate in the RFC the limitations resulting from his memory problems that Dr. Bobholz noted. Here again, however, as noted above, the ALJ not only gave great weight to Dr. Bobholz's opinion, but expressly formulated the RFC with that limitation in mind. Plaintiff may disagree with the ALJ's determination of his RFC, but it is the ALJ's responsibility to

determine the RFC. 20 C.F.R. § 416.946(c). Based on his assessment of the credibility of Plaintiff's statements concerning his symptoms and the medical opinions provided, the ALJ's determination finds substantial support in the evidence. With no error having been shown, the ALJ's determination must stand.

## CONCLUSION

For the above reasons and having found no error, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

Dated this __27th__ day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court